WARWICK, guardian, *v.* SUPREME CONCLAVE KNIGHTS OF DAMON.

Where a certificate in the nature of a policy of life-insurance has been issued by a benefit association to one of its members, promising to pay out of its beneficiary fund to the wife of the member a specified amount upon his death, and where it is stipulated in the certificate that it is issued upon condition "that the said member complies in the future with the laws, rules, and regulations now governing said conclave and fund, or that may hereafter be enacted by the Supreme Conclave to govern said conclave and fund," the non-payment of an assessment made upon the member for the common benefit fund, which has become due and payable under the laws of the association, will not, ipso facto, amount to a forfeiture of the benefit of life-insurance provided for in the certificate, it appearing that there is no law or rule of the association expressly providing that such non-payment will of itself work a forfeiture.

(a) Even where the rules of the association indicate that such non-payment

of a monthly assessment by a member is a ground of suspension, a forfeiture of his benefits under the certificate will not result from such non-payment, unless there has been some judicatory or affirmative action by the association declaring the member suspended.

(b) The mere fact that the collector of such association has entered upon the account of the defaulting member the word "suspended," and has recorded the same on the books of the association, would not amount to such; affirmative action; the collector not being empowered to declare a member suspended for any reason, and no action whatever having been taken by the association approving or authorizing such entry on his books.

Argued February 17, — Decided March 18, 1899.

Action on insurance policy.    Before Judge Ross.    City court of. Macon.    August 31, 1898.

*Hardeman, Davis & Turner*, for plaintiff.   *Hall & Wimberly, A. W. Lane* and *Steed, Ryals & Stone*, for defendant.

LEWIS, J.    It appears from the record in this case that the following facts were developed on the trial below: On the 13th of October, 1891, the Supreme Conclave Knights of Damon issued to James A. Kennedy what is known as a benefit certificate, upon evidence received from the subordinate conclave in Macon that he was a third degree member of that conclave and was a contributor to the benefit fund of the order issuing the certificate.    The conditions named in the certificate were, in substance, that the statements made by Kennedy in his petition for membership and certified by him to the medical examiner were made a part of the contract, and the further condition that he would comply "in the future with the laws, rules, and regulations now governing the said conclave and fund, or that may hereafter be enacted by the Supreme Conclave to govern said conclave and fund."    These conditions being complied with, the Supreme Conclave promises and binds itself in the certificate to pay out of its beneficiary fund to Fannie W. Kennedy, the wife of the applicant, $3,000, in accordance with the provisions of the laws governing the fund, upon satisfactory evidence of the death of the member, or a sum not exceeding $1,500 upon satisfactory evidence of the permanent total disability of the member, and upon surrender of the certificate; provided that the member is in good standing in the order at the time of the death or disability.    Besides paying a stated

sum to its members upon death or disability, it seems that another object of the association was to look to the social and moral culture and enjoyment of its members. Two kinds of payments were required of members of the association; one was known as "dues," which were payable quarterly in advance and belonged to the subordinate conclave. With these dues it seems the Supreme Conclave had nothing to do. The other payment required was known as an "assessment," which was paid by the member to the collector of the subordinate conclave and by the latter forwarded to the Supreme Conclave. This assessment from the various members of the association, it seems, constituted the fund relied on for meeting its obligations under the benefit certificates. In the case of Kennedy the assessment amounted to $2.28 per month. On the 30th day of August, 1895, Kennedy, while away from home, was killed in a wreck on a railroad. He had paid all dues since his membership required of him up to October 1, following his death, and at the time of his death he was not in arrears for any assessment save for the month of August, 1895. Prior to his death his wife had died, and when he died he left as his only heir at law a minor son, who, under the rules of the association, became the only beneficiary under the benefit certificate. Warwick, the guardian of this minor, brought suit on the certificate, in the city court of Macon, against the Supreme Conclave Knights of Damon. On the trial of the case, after the testimony for both parties had closed, the court directed a verdict for the defendant. Whereupon plaintiff moved for a new trial, and in his bill of exceptions complains of error in the judgment overruling his motion.

The defense relied upon was, that the non-payment of the assessment for August, 1895, operated as a forfeiture of the insurance and of all benefits under the certificate. The laws of the Supreme Conclave and of the subordinate conclave of which deceased was a member were introduced in evidence, and we refer in this connection to such portions of them as seem to bear upon the issue involved in this case. It is provided in the first section of the laws of the Supreme Conclave, that "Every applicant, before becoming a member, shall pay to

the collector, in accordance with his age and the amount of protection applied for, a monthly assessment as provided in the following table, and shall continue to pay the same amount on the first day of each month thereafter whilst remaining a member of this order in good standing." Section 6 of these laws declares that, "On the death of a member, who at the time of his death shall not be under suspension for the non-payment of benefit assessment, the conclave shall appoint a committee to ascertain the cause of death and the circumstances attending the same." The section then provides for forwarding the report of the committee and proof of death to the supreme secretary. Section 9 provides, that "Monthly assessments shall be due and payable to the collector, without notice, on the first day of each and every month, and it shall be the duty of every subordinate conclave to immediately forward to the supreme treasurer the assessment due from every member." Section 10, among other things, declares that, "If such monthly assessment is not received by the supreme secretary on or before the twentieth day of the same month, the supreme commander shall declare such conclave suspended, and the supreme secretary shall forward notice of such suspension to the secretary of the subordinate conclave, giving the cause and date of such suspension in said notice." Section 1 of law 8 provides, that "Any member considering that a decision is unjust, or not in accordance with the constitution and laws of the order, shall have the right to appeal in the manner described as follows: from the commander to the conclave at the same meeting; from the conclave to the supreme commander within thirty days." Section 1 of article 5 of the constitution governing subordinate conclaves provides, among other things, that "The commander . . shall declare in open conclave, such members suspended as are in arrears for assessments or indebtedness to the conclave for more than three months dues." Section 6 of the same article declares, "The collector shall keep full and correct accounts between the conclave and its members, receive all money due the conclave, and promptly pay the same to the treasurer, taking his receipt therefor; he shall supply all members with assessment notice

cards, and notify each member when they are in arrears to the amount of three months dues; and when a member is in arrears to the amount of six months dues or for an assessment, he shall notify the commander of the fact." Section 1 of article 8 simply declares, that "Any member entitled thereto in good standing, not in arrears for dues or fines, having become a member six months previously, who may become disabled, by sickness or accident, from following his usual business, shall, if such disability continues for more than one week, receive from the funds of this conclave a sum sufficient to pay his dues and assessments thereafter maturing, while said sickness or other disability continues, and such additional benefits as the conclave may by by-laws prescribe, not exceeding in amount per week," etc.

It appears from the evidence in the record, that while the written by-laws required assessments due the Supreme Conclave to be paid on or before the 1st day of the month in advance, there had been, for two or three years before the death of Kennedy, an understanding between the officials of the conclave and its members that these assessments need not be paid until the 20th of each month. It further appeared that almost invariably Kennedy had paid his assessment prior to the 20th. While the rule of the Supreme Conclave required the subordinate conclave to forward assessments by the 20th, the testimony showed that even the Supreme Conclave received from this particular subordinate conclave in Macon assessments several days after the 20th. It appears that in July, 1895, Kennedy paid all his dues up to October and also paid his assessment for July, but he failed to pay his assessment for the month of August. Being in default, the collector, when he made out his account the latter part of the month, marked Kennedy thereon as "suspended," and forwarded the account, or a copy of it, to the proper officer of the Supreme Conclave. This official, on the 31st day of August, after the death of Kennedy, mailed him a notice informing him of his suspension. This August account with Kennedy marked "suspended" thereon was by the collector of the subordinate conclave entered on the books of that conclave, the collector being the custodian of the books. It ap-

pears from his testimony that no vote of the order was taken declaring the suspension. It does not appear that the minutes were ever approved or that even any announcement was had in a meeting of the conclave that Kennedy had been suspended on account of the non-payment of an assessment. The secretary of the Supreme Conclave testified, in effect, that his conclave had nothing to do with suspending members for non-payment of assessments, but that that was the duty of subordinate conclaves. He also said in his testimony that "when a member failed to pay an assessment when due, he suspended himself."

1. It is contended by counsel for defendant in error, that on account of the failure by the deceased to pay his assessment for the month of August, he thereby became suspended from all benefits under his certificate, and that having died pending this suspension, all right of insurance under his certificate was forfeited. This contention is obviously based upon the idea that under the terms of the contract between the parties, taken in connection with the constitution and by-laws of the conclave, which entered into and formed a part of the contract, non-payment of an assessment when due amounted ipso facto to a forfeiture of all right of insurance under the benefit certificate. It will be noted, in the first place, that the relation which existed between this conclave and the deceased is somewhat different from that existing between an ordinary insurance company and the insured. The defendant in error is what is usually denominated a mutual benefit association. The insured is a member of that association, and occupies very much the same relation to it that a stockholder does to a corporation in which he holds stock. No one is entitled to benefits of insurance in the defendant conclave, except a member thereof, who is a contributor to the common benefit fund of his order. He therefore occupies in a certain sense the position of both insurer and insured. It seems to be the view of respectable authority that, on account of the close fraternal relation existing between the members and the society itself, the law is more cautious in construing in such cases, than it is in ordinary contracts of insurance, any act of the insured into a forfeiture of any right which he may have acquired by virtue of his con-

tract of insurance. Whether there is any proper distinction to be drawn between this class of contracts and those made with an ordinary insurance company in which the insured is not a member, it is a rule of law, well settled and uniformly recognized as applicable to such cases, that "forfeitures are not favored in the law, and in order to work a forfeiture of the rights of membership in a mutual association it must clearly appear that such was the meaning of the contract; and the facts upon which a forfeiture is claimed must be proved by the most satisfactory evidence." There is also a well-recognized rule of construction, applicable to insurance companies generally, to the effect that contracts of insurance prepared by the insurer will be rigidly construed against him and liberally construed in favor of the insured. In the case of *Massachusetts Benefit Association* v. *Robinson*, 104 *Ga.* 256, this principle is declared in the following words: "If a policy of insurance is capable of being construed in two ways, that interpretation must be placed upon it which is most favorable to the insured." See the opinion of Justice Cobb on this point, and the authorities cited therein. This doctrine is directly applied to benefit associations in 3 Am. & Eng. Enc. L. (2d ed.) 1067, in the following language: "When the rights of members or their beneficiaries are involved, by-laws declaring a forfeiture are to be construed strictly if their validity is called in question, and liberally if it is sought to bring such claimants within their provisions, so as to prevent a forfeiture in either case, and in order to do complete justice." The following cases are examples of the rigidness with which this principle has been enforced by the courts: In Masi *v.* Congrega San Donato, etc., 40 N. Y. Supp. 667, it was decided that under a provision of the constitution of a mutual benefit society, that any member failing to pay his "monthly dues or other dues" for a certain time should forfeit his membership, a forfeiture would not result unless the default was as to both monthly dues and other dues. In the case of Osterman *v.* District Grand Lodge, 43 Pac. (Cal.) 412, it was held that, "Where the laws of a mutual endowment association make suspension for non-payment of dues a forfeiture of membership benefits, and provide a formal

method for suspension in such case, non-payment of dues will not, ipso facto, work a forfeiture, though the assured was secretary of the society, and formal proceedings have not been had because he failed, as required, to report his own delinquency."

Following as a necessary corollary to this doctrine, and clearly sustained both by reason and authority, is the further rule made especially applicable to mutual benefit associations, that a failure by a member who has acquired such a benefit certificate as appears in this record to comply with any particular law, rule or regulation in the constitution and by-laws of the society does not, ipso facto, work a forfeiture of his membership benefits.    Before such non-compliance can of itself amount to a forfeiture, it must be clearly shown that some rule of the association, which enters into and forms a part of the contract between the parties, expressly so provided.    Where there is no such express provision, some judicatory action must be taken by the lodge having jurisdiction over the matter, formally declaring the suspension or adjudging the forfeiture.    In 3 Am. & Eug. Enc. L. (2d ed.) 1086, this principle is recognized in the following language: "It should be clear that a condition that the obligation of the association to pay benefits or insurance depends upon the compliance by the member with all the laws of the association, is not a condition the failure of which works an absolute forfeiture, but one which calls for an affirmative exercise of jurisdiction by the association to produce that effect." In 2 Bacon, Benefit Societies and Life Ins. § 385, the rule is made directly applicable to the non-payment of assessments and is stated in the following way: "Unless the constitution and laws of the society make non-payment of an assessment operate as a forfeiture, the failure of a member to pay such assessment only makes him liable to expulsion from the society or suspension from its benefits, for which some affirmative action of the lodge, or society, is necessary, and the mere act of the secretary in marking the member's account as 'suspended' is not sufficient."    See also 2 May, Ins. § 560, B; Thompson *v.* U. S. Co., 104 U. S. 252.

After a very careful review of authorities, both text-books and decisions of courts of other States, we have reached the con-

clusion that there is really no conflict of authority touching the soundness of the views heretofore expressed as principles of law. The apparent conflict arises out of. the applications of these principles to the facts of particular cases.   Some courts have been more rigid in their construction of these contracts against the insurer than others; but upon a careful review of the authorities cited by counsel for defendant in error, as well as many others we have examined, there is none which would authorize such a construction of the contract under consideration in this case as would work a forfeiture of benefits thereunder.   For instance, in the case of Pitts *v.* Hartford Life & Annuity Co., (Conn.) 34 Atl. 95, it was simply ruled that "Where a mutual benefit certificate, and the application for it, provide that if the monthly dues, assessments, etc., required to be paid, are not paid to the company on the day due, the certificate shall be void, the payment of such dues and assessments is a condition precedent to any subsequent liability of the company; and it need not take any action declaring a forfeiture in order to relieve it of liability."   The distinction between that case and this one will be readily seen; for there it appears from the decision itself that the contract expressly provided that such nonpayment would operate to render the certificate void.    In Scheele *v.* State Home Lodge, etc., 63 Mo. App. 277, it appeared that the by-laws of the benefit society required members to pay assessments within thirty days after notice.   It was held by the court that a violation of this requirement worked a forfeiture of a member's right under the certificate, and at his death he was not a member in good standing.   But by reference to the facts of that case on page 282 it will be seen that it was provided in the by-laws, which formed a part of the contract, in "plain and unambiguous" terms, that "no certificate shall be binding, nor shall any assessment be made to meet the requirements of any certificate, whose holder is in *arrears* for more than thirty days on any legitimate assessment thereunder." Evidently the court meant to rule that such language expressly provided for a forfeiture on account of non-payment, ipso facto. In Lyon *v.* Sup. Assembly Royal Soc., (Mass.) 26 N. E. 236, payment of the policy was conditioned on the member's being

in good standing; and, under the terms of the constitution of the society, in point of fact he was not in good standing at the time of his death. There is nothing in that case in conflict with the ruling made in the present case, or with the decision of the same court in Chamberlain v. Lincoln, 129 Mass. 70. It was decided in the latter case, that although a subordinate lodge has done acts which render it liable to have its charter declared forfeited by the grand lodge, yet until such forfeiture has been declared it has lost none of its rights to the property of the lodge. In the case of Borgraefe v. Supreme Lodge, etc., 22 Mo. App. 127, while it was decided that non-payment of an assessment worked a forfeiture, it appears that the decision was based upon the idea that the member stood suspended by operation of the laws of the order. In the report of the facts of that case it further appeared that the plaintiff's wife, who was a beneficiary member of the lodge of the defendant, paid for her husband the price of what was known as a withdrawal card, and presented his resignation as an officer of the lodge. The facts, therefore, upon which that decision was based are quite different from those presented by this record. There is not a single provision contained either in the benefit certificate sued upon, or in the laws of the conclave which were introduced in evidence by the defendant and claimed by it to constitute a part of its contract, expressly making the non-payment of an assessment operate per se as a forfeiture of any benefit which the deceased had acquired under the certificate. There is quite a difference between suspension itself and a ground of suspension. The conclave in this case no doubt had the *right* to suspend this member; and such suspension would have worked a forfeiture of his benefits. But it also had the privilege to waive this right, and exercised it by failing to take any affirmative action in the matter.

The first law of the conclave, quoted above in the statement of the facts of the case, simply declared that every applicant before becoming a member should pay a certain monthly assessment and should continue to pay the same thereafter on the first day of each month. There is no provision in that clause expressly working a forfeiture solely on account of de-

fault in making this payment. Section 6, referred to above, declares that on the death of a member who at the time of his death shall not be *in suspension* for the non-payment of benefit assessments, the conclave shall appoint a committee to ascertain the cause of his death, etc.  The rule might have been quite different if instead of the words "*in suspension*" the words "*in arrears*" on his benefit assessments had been used.  The next section quoted (9) simply declares that the assessments shall be due and payable to the collector without notice on the first day of each month.  We have carefully examined not only these clauses and others to which our attention has been directed, but also the entire by-laws and constitution of the order in this record, and we have failed to find a single provision therein expressly declaring, or even indicating, to our minds that it was the intention of the parties that non-payment of assessments should, ipso facto, work a forfeiture.  Section 1 of article 8 of the constitution of the subordinate conclave provides, among other things, that any member who may become sick or otherwise disabled while in arrears to the conclave for dues and fines can by paying the same become entitled to receive benefits during such sickness or disability.  This provision has no application in this case; for, in the first place, a member must be in arrears for both dues and fines, and the term "assessment" is not used ; and, as above indicated, the term "assessment" applies to payments to be made the Supreme Conclave, and "dues" to money owing the subordinate conclave.  Besides this, the article has no reference whatever to benefits arising from the death of a member, but simply to such benefits as he may be entitled to during illness or disability.  Section 1 of article 5 of the constitution provides, among other things, that the commander (referring to the commander of the subordinate conclave) shall declare in open conclave such members suspended as are in arrears for assessments, or indebtedness to the conclave for more than three months dues.  It appears from the record that no action was ever taken by the subordinate conclave or the Supreme Conclave, or by any authorized official of either, even declaring that Kennedy stood suspended on account of the non-payment of his assessment.  All the action taken

was by the collector marking on the account of the deceased the word "suspended" and entering the account upon the books of the conclave in his custody, and transmitting the account, or a copy thereof, to the Supreme Conclave. No duty or power is conferred by the laws of the order upon the collector to declare any member suspended for any reason. As to his entry upon the books, it appears from his own testimony that no vote was taken by the conclave on the matter, and that it was simply his own act, for which he alone was responsible. The Supreme Conclave took no action, save that one of its officers mailed a notice to the address of the insured after his death, attempting to inform him of his suspension. In fact the evidence on the part of the defendant showed that the Supreme Conclave had nothing to do with the suspension of a member for non-payment of dues or assessments, but that that was a matter concerning only the subordinate conclave.

In addition to what has been said, we think the citation of a few of the authorities bearing upon this question will clearly show that the general, if not the uniform, drift of judicial opinion upon this subject would constrain us to hold that the facts of this record wholly fail to show that the deceased had forfeited his rights under this benefit certificate. In the case of Scheu *v.* Grand Lodge, etc., 17 Fed. Rep. 214, it was held that the mere non-payment of an assessment did not of itself operate as a suspension, and that the act of the secretary in marking the account of the insured as "suspended" was not sufficient, as such suspension must be made by some affirmative action of the lodge. It further appeared in that case that while the member was in default in not paying the assessment of the subordinate lodge, the latter had advanced the amount to the grand lodge, and this amounted to a waiver of suspension by the grand lodge. We cite the case to show that the action of the secretary, which was the same as the act of the collector in this case, amounted to nothing. There were two principles decided in the case. One was, that the mere non-payment did not of itself operate as a suspension; and the other was, that the act of the secretary in marking the account would not work such suspension. In the case of Columbia Insurance Co. *v.* Buckley, 83 Pa. St. 293,

it appeared that that company was a mutual fire-insurance com-
pany, and that the contract provided that if the amount as-
sessed upon the premium note given on the policy was not
paid within thirty days after assessment, the policy should be
void.    Due notice of assessment was given and demand of pay-
ment made.    It was held that although a condition be attached
to a policy declaring it void on failure to pay an assessment
upon a premium note within a specified time, default in pay-
ment would not ipso facto avoid the policy.    As an illustration
·of the rigid construction given contracts of the character in-
volved in the present case, we quote the following from the
·opinion on page 296: "To secure a more prompt payment of
the assessments, most companies have inserted a clause in their
policies, declaring the same shall be void unless the assessment
be paid within a specified time after notice.    The word *void*, in
·a contract, has often been held to mean *voidable* only, and at
the election of the party wronged."    In the case of High Court
Ind. Order, etc., *v.* Edelstein, 70 Ill. App. 95, it was decided
that "a provision in the constitution of a benefit society, that
members 'shall be dropped from membership in the order' for
failure to pay assessments, is not self-executing, but requires, in
order to terminate the membership, the affirmative action of
the corporation to ascertain and declare the forfeiture."    As
bearing directly upon the issue involved, see also the following
·cases: Petherick *v.* Order of the Amaranth, 72 N. W. 262;
Lamarsh *v.* L'Union St. Jean Baptiste, etc., (N. H.) 38 Atl.
1045; Knights of Honor *v.* Nixon, (Tex.) 12 S. W. 175; San-
ford *v.* Mutual Fire Ins. Ass'n., 63 Cal. 547.

From the above principles and their application by, to say
the least, the decided weight of authority, we have reached the
following conclusions: (1) In determining the meaning of bene-
fit certificates of the character involved in this case, the law
adopts a rigid construction against the association preparing the
·contract.    (2) The law does not favor a forfeiture, and conse-
·quently courts will seek to give a construction to a contract, if
permitted by its terms, that will avoid such result.    They there-
fore will not declare a forfeiture unless expressly required to
·do so by the terms of the contract.    (3) A benefit certificate of

the character involved in this action will not be construed as intending a forfeiture of benefits thereunder for failure to comply with any rule in the constitution and laws of the association. (4) Before such non-compliance can, ipso facto, amount to a forfeiture, some rule of the association that enters into and forms a part of the contract must expressly so provide. If there is no such provision, affirmative action must be taken by the lodge having jurisdiction of the matter, formally declaring the suspension or adjudging the forfeiture. (5) Such requisite action is not had by the collector simply marking on the delinquent's account "suspended" and entering it on the books of the association; it not appearing that such official had authority to declare the suspension, and it further not appearing that his entry upon the minutes of the association was ever authorized by it, or by any official who had authority to act in the premises. Applying these principles to the facts of this case, we are of opinion that the court below erred in directing a verdict in favor of the defendant. It is a harsh rule to declare that one who, like the deceased, has for years been paying his dues and assessments to his company and by accident has met with his death after being in default for a few days by failing to pay a monthly assessment of less than three dollars, thereby forfeits all benefit from his investment. When he has *expressly* made such a contract, the courts will enforce it; but on account of the harshness of the rule, the law will construe the contract liberally in his favor, and will never imply such an agreement from such facts and circumstances as are presented by the record before us.     *Judgment reversed. All the Justices concurring.*