## SUPREME CONCLAVE KNIGHTS OF DAMON
### *v.* WARWICK, guardian.

1. Where the by-laws of a mutual benefit society require its members to make payments of the assessments by a certain day in each month or be suspended, and it appears that a member failed to pay his assessments within the time required, and his failure to pay was reported to the lodge by its collector, and the lodge took affirmative action suspending the member. and he died thereafter without having been reinstated, the society is not liable on the contract of insurance issued to the member before his suspension.

2. Under the by-laws of the subordinate lodge it was not necessary, in order to suspend a delinquent who had failed to pay his assessments, to have him tried by the lodge. All that was neccessary was a report to the lodge of his delinquency and affirmative action thereon by the lodge.

3. An offer by a third person, made after the expiration of the proper time of payment, to pay the assessment of the delinquent, will not bind the society. This is especially true when the offer was made to a boy who, so far as the record discloses, had no authority to bind the society.

Argued March 9, — Decided April 5, 1900.

Action on insurance policy. Before Judge Nottingham. City court of Macon. August 1, 1899.

*Hall & Wimberly* and *A. W. Lane,* for plaintiff in error. *Hardeman, Davis & Turner,* contra.

SIMMONS, C. J.    1. The present case has been before this court on a previous occasion and will be found reported in 107 *Ga.* 115.    Most of the facts necessary to a clear understanding of the questions now made will be found there reported.    A new trial was then granted, principally upon the ground that the evidence failed to show that the subordinate lodge or conclave had taken any affirmative action upon the report of the collector as to the delinquency of Kennedy, the deceased member. There was no dispute, then or now, that Kennedy had failed to pay the assessment due on August 20, 1895, but the evidence on the former trial failed to show that the subordinate lodge had taken any affirmative action resulting in his suspension for non-payment of the assessment.    The evidence in the present record shows positively and, in our opinion, conclusively that the lodge did take affirmative action suspending him.    It shows that the collector reported Kennedy, with two others, on August 28, 1895, as being delinquent; that this report was received by the lodge; that each name reported as delinquent was called by the presiding officer; that the report was voted on and adopted, and all who had been reported as delinquent, including Kennedy, were thus suspended by a vote of the lodge.    The presiding officer then announced that they were so suspended, and the proceedings were placed upon the minutes and were affirmed at the next meeting of the lodge.    The suspension of the delinquents was reported to the supreme conclave.    Thus it appears that the evidence of the defendant came fully up to the rule laid down by this court when the case was here before. The plaintiff was, therefore, not entitled to recover, and the verdict against the defendant was contrary to law.

2. It was earnestly contended by the learned counsel for the defendant in error, that before Kennedy could have been properly suspended he must have had notice that charges had been preferred against him that he had failed to pay his assessments, and must have had a trial before the lodge.    We think that there is nothing in the by-laws to sustain this contention. The eleventh and twelfth articles, upon which this contention was mainly predicated, seem to us to apply to entirely different matters.    The eleventh fixes penalties for improper con-

duct on the part of members of the lodge. It enumerates misappropriation of funds of the conclave, divulging the secrets of the order, entering the conclave in a state of intoxication, being guilty of any immoral practice or improper conduct in violation of duty and unbecoming a member of the order, and obtaining benefits by improper means. Under the twelfth article the commander was required, whenever a member was reported to the commander or to the lodge as having violated any part of the preceding article, to appoint a committee of three to investigate the matter, hear evidence from both sides, and, in the event of their concluding that the charges were well founded, to prefer charges against the member. These charges were to be read in open meeting, a trial had, and the member, on conviction, subjected to fine, suspension, or expulsion, as provided in the eleventh article or in the discretion of the lodge. It was clearly not contemplated by the framers of these by-laws or by the lodge adopting them that these proceedings should be had in order to suspend a member for the non-payment of his assessments. The by-laws provided that the assessments should be paid by a certain day each month. The proceedings provided for in the twelfth article would certainly have lasted fully a month unless the committee had devoted their entire time to the investigation. Indeed, had such proceedings been undertaken against every member who was delinquent, the lodge would probably have devoted much or all of its time to these trials. The record shows that several members were reported as delinquent at each meeting, and that the lodge met at least once in every month. We think that no such trial was contemplated or necessary to the suspension of a member for the non-payment of his assessments. Article five expressly gave to the commander the authority to declare a member suspended for non-payment of dues and assessments. We think, therefore, that the true intention of the constitution and by-laws of this order was that a member might be suspended for the non-payment of his assessments upon the report of the collector, the vote of the lodge, and the announcement of the presiding officer. This method was simple, plain, and easily understood by the members. They joined the order under this

constitution and these by-laws, and they and their heirs must abide by them.

3. It was further contended that Kennedy was not a delinquent, because the son of the collector went to Kennedy's place of business, and the clerk, in Kennedy's absence, offered to pay the assessment. The collector's son found he had not brought the proper receipt, and said he would call again. This is claimed to have been such a tender as would relieve Kennedy from liability to suspension. It was certainly not a tender. There was no specific amount of money tendered, but only an expression of willingness on the part of the clerk to pay the assessment if he knew its amount. This was done after the expiration of the time when the assessment should have been paid either under the by-laws or according to the custom prevailing among the members of the lodge. The by-laws required the assessment to be paid by the first of each month, but it was the custom of the lodge to allow the members to pay as late as the twentieth. Kennedy's clerk testified that he made the alleged tender on the 28th or 29th of the month, which was too late, even if the money had been tendered, to bind the supreme lodge. Further than this, the record fails to show that any authority was given the collector's son to bind the lodge or order by any promise he might make to return to receive the money due. It appears that he was simply a young lad, the son of the collector, whom the collector sent after the members' dues and assessments for the convenience of the members. There was no evidence that the collector had delegated to him any power to make any promise which would be binding on the society. He was merely a messenger of the lodge's agent, and had no authority to bind the lodge by any promise.

It is unnecessary to further discuss the many grounds of the motion for a new trial, as we are clear that the verdict was contrary to law and without evidence to support it, and that the court should have granted a new trial.

*Judgment reversed. All the Justices concurring.*